Alfonso Vitello and Emily F. Vitello v. Commissioner.
Vitello v. Commissioner
Docket Nos. 59547, 62906.
United States Tax Court
T.C. Memo 1959-176; 1959 Tax Ct. Memo LEXIS 72; 18 T.C.M. (CCH) 771; T.C.M. (RIA) 59176; September 17, 1959
*72 Held, that petitioners understated their income for each of the taxable years involved; and that the amounts of unreported income for said years, reflected by respondent's net worth statement as herein adjusted, are approved. Held, that part of the deficiency for each of the taxable years, is due to fraud with intent to evade tax. Held, further, that assessment of the deficiency for each of the taxable years, is not barred by statutory limitation. Ralph W. Squier, Esq., for the petitioners. J. Earl Gardner, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in petitioners' income taxes and additions to tax, as follows: Additions to tax
Docket No.
Year
Deficiency
Sec. 293(b)
Sec. 294(d)(2)
59547
1947
$ 6,936.94
$3,468.47
1948
1,906.28
953.14
1949
815.26
407.63
1950
127.00
63.50
62906
1951
12,831.24
6,415.62
$ 763.54
1952
18,658.90
9,276.64
1,286.53
*73 The cases were consolidated for trial. The issues for decision are: (1) Whether the petitioners understated their income for each of the taxable years involved. (2) Whether at least part of any deficiency for each year involved, is due to fraud with intent to evade tax within the meaning of section 293(b) of the 1939 Code. (3) Whether, as to each of the years 1947, 1948, 1949 and 1951, assessment of any deficiency is barred by statutory limitation. As to the years 1947, 1948 and 1949, respondent agrees that the periods of limitation have expired, unless the returns were false or fraudulent with intent to evade tax within the meaning of section 276(a). As to the year 1951, if it should be decided that the period of limitation is not open under said section 276(a), it must further be decided whether such period is open under section 275(c), which pertains to situations where a taxpayer has omitted from gross income an amount which is in excess of 25 per centum of the gross income stated in the return. As regards the years 1950 and 1952, the parties have stipulated that the period for assessment has not expired. The additions to tax under section 294(d)(2) for the years *74 1951 and 1952, are not contested except as the amounts thereof would be affected by reduction of the deficiencies. All other issues raised in the pleadings have been settled by stipulation of the parties. Findings of Fact Certain facts have been stipulated. The stipulations of fact, together with the exhibit attached to one of them, are incorporated herein by reference. The petitioners, Alfonso and Emily F. Vitello, are husband and wife. They filed a joint income tax return for each of the taxable calendar years involved, with the collector or director of internal revenue at Los Angeles, California. Preliminary Facts re Petitioners Petitioner Alfonso Vitello (sometimes also referred to in the evidence as Al Vitello, Albert Vitello and Albert Ditello) was about 35 years of age in the first taxable year here involded. His parents has come to the United States from Italy in 1907, immediately following their marriage. For about 8 years thereafter, they lived in Pennsylvania, where the father worked in coal mines; and they then moved to Montana, where the father first worked in a mine and in a lumber yard, and where he and his wife later opened and operated a small grocery *75 store. At about the beginning of the first World War, the family moved to Cleveland, where the father worked for a time as a factory machinist, and also sold small amounts of cheese, salami and other food products which were sent to him from Italy by his brother. Beginning in about 1920, he opened a small neighborhood grocery store in Cleveland; and the operation of such grocery store business, at one location or another, was his sole business occupation until his death in the year 1926. He left, as his survivors, his widow and six children. Neither Alfonso's father nor his mother ever filed an income tax return; and no estate tax return was filed for his father's estate. At the time of the father's death, the family home was encumbered with a mortgage of about $2,000, which was paid off by members of the family over the subsequent 12-year period. Alfonso has not contended that he received any gift or inheritance from his father. Following the death of the father, the Vitello family continued to live in Cleveland for several years. The mother took in sewing at home; and Alfonso, who was then about 14 years of age, learned the barber trade. Beginning about 2 years later, Alfonso *76 operated a one-chair barbershop while attending school, and he also worked as a part-time assistant to a newspaper route manager. Later, he worked for a time in a factory. His brother Leo worked also, and earned about $30 per week which he gave to his mother. In 1938 or 1939, Alfonso and his brother Leo purchased a bar and grill in Cleveland, which they thereafter operated for about 2 years. Most of the profits from this business were consumed in paying off the indebtedness which was incurred in its purchase. In late 1939, Alfonso contracted tuberculosis and spent about a year in a sanitorium. In 1941 he married the petitioner Emily; and during the taxable years involved, they were the parents of two children. In October 1943, Alfonso and his wife moved to Oceanside, California. Alfonso's mother also moved there at about the same time. Leo had preceded them there in 1941; and a younger brother, Arthur, joined the family upon his discharge from the military service in 1945. From 1943 to 1946, Alfonso and his wife, together with Leo, operated a cafe in Oceanside. Neither Alfonso nor his wife filed an income tax return for any of the years 1939 through 1941. For the year 1942, they *77 filed a joint return on which no tax was shown to be due. For the year 1943, they filed a joint return on which a tax of $1,418.99 was paid. And for the years 1944 through 1946, they reported the following amounts of adjusted gross income: 1944 - $38,231.99; 1945 - $8,390.10; and 1946 - $5,585.01. Alfonso, in April 1944, deposited $10,000 of currency in a bank account maintained in the names of himself and his mother. This account was closed in December 1945; and the balance of $10,124.50 was then deposited in a new account in the same bank, which was maintained in the names of his mother and his brother Leo. No withdrawals were made from said account until August 1948. In January 1951, this second account was closed, and the balance of $9,158.71 was transferred to a savings account in another bank, in the name of Alfonso's mother. It has been stipulated that for each of the years 1946 and 1947, Alfonso's mother was claimed as a dependent of Leo on the latter's income tax returns. Facts re Petitioners' Known Sources of Income, During the Taxable Years Involved During the years 1947 through 1952, Alfonso derived income from several known sources, including the operation of *78 various cafes or taverns, gambling activities, the purchase and sale of business properties, and miscellaneous rents and interest. The material facts regarding these sources of income are as follows: Casa Blanca Cafe and Bar. - This cafe and bar, which was located in Oceanside, California, was acquired by Alfonso and his brothers Leo and Arthur, in 1945; and it was operated by them as equal partners throughout all taxable years involved. Arthur's interest in such business was given to him by his brothers. Arthur was the manager, and he devoted full time to such work. Alfonso took no active part in the management of this business. Alfonso, in his income tax returns, reported the following amounts as his distributive shares of the Casa Blanca partnership's profits or losses: 1947 - income of $1,206.08; 1948 - loss of $895.44; 1949 - loss of $1,170.76; 1950 - income of $2,402.69; 1951 - income of $2,321.30; and 1952 - income of $3,128.39. The respondent, in his notices of deficiency, increased the amounts of Alfonso's distributive shares from said partnership, by $1,000 for each of the first 4 years; and he made no adjustment as to the share for the other two years. The petitioners *79 have conceded, by stipulation, that the adjustments so made are correct. Top Hat Cafe and Bar. - This cafe and bar, which was located in Oceanside, was purchased by Alfonso in April 1948; and it was operated by him until its sale in March 1949. On his income tax return for the year 1948, Alfonso reported a loss from the operation of this business of $2,249.99; and in his return for the year 1949, he did not report anything with respect to this business. The respondent, in his notice of deficiency, reduced the reported 1948 loss by the amount of $113.31. The petitioners have conceded, by stipulation, that this adjustment is correct. Upon the sale of the business in 1949, Alfonso derived a long-term capital gain of $2,433.02, of which 50 per cent (or $1,216.51) was includible in his gross income. He did not report any of said gain for income tax purposes. From the time the business was sold in 1949 until sometime in 1951, Alfonso held certain obligations of the purchaser, which he received in connection with the sale transaction. Roma Inn. - This cafe was located in San Diego, California. Alfonso and his brother Leo purchased it in April 1949 as a going business, together with *80 the liquor license and the furniture and fixtures. It was operated by them as partners, for approximately 7 months; and it then was sold. The partners claimed a loss of $2,628.63 from its operation in 1949; and Alfonso, in his income tax return for said year, reported that his share of such loss was $1,314.32. Upon the sale of this business in 1949, the partners derived capital gains; and Alfonso, in his income tax return for said year, reported the net amount of $1,343.34 as his share thereof. The respondent, in his notice of deficiency, increased the amount of Alfonso's said share by $843.33. Petitioners have conceded, on stipulation, that this adjustment is correct. From 1949 until January 1951, Alfonso retained an interest in certain obligations of one of the purchasers, which were received in connection with the sale of the business. Phil's Cafe. - This cafe was located in Oceanside. On about August 19, 1950, Alfonso rented the cafe premises for a 5-year period; and at about the same time, he also purchased, with his own funds, the furniture and fixtures of the cafe which was then being operated by other persons. At about the time Alfonso purchased said cafe, he was (as *81 is hereinafter more particularly shown) convicted in a California State court, of an offense pertaining to bookmaking on horse races. Thereafter, when he applied for a liquor license for Phil's Cafe, the issuance of such a license either to him or to his wife, was refused; and, because of this, such license was obtained in the name of Alfonso's brother Arthur. The license was apparently acquired, with the consent of the public authorities, by purchase from the prior owners of the cafe. The entire purchase price of the license was paid by Alfonso and his wife. Phil's Cafe was opened early in the year 1951; and immediately after Alfonso was released from jail on February 27, 1951, where he was held following his abovementioned conviction, he assumed the complete management and control of the cafe. Arthur's sole interest in the business was that of being the nominal holder of the liquor license. He performed no services in connection with said business; drew no salary therefrom; and derived none of the profits. Also, he at no time sought or was given any accounting in respect to the operations of the business. In 1954, this cafe was closed by the local authorities, as a public nuisance. *82 The business then was sold, and the proceeds were invested in rental property from which Alfonso received all the rental income. Alfonso, and not Arthur, was at all times material the owner of this cafe. Alfonso, in the joint income tax returns which were filed by him and his wife for the years 1951 and 1952, reported as his only income from Phil's Cafe, a salary of $5,000 for the year 1951, and a salary of $5,000 plus a "bonus" of $7,000 for the year 1952; and his wife also reported for the later year a salary from said business of $900. Arthur, on the other hand, in his income tax return for said years, reported business profits from Phil's Cafe in the amounts of $11,651.27 for the year 1951, and of $13,228.21 for the year 1952. All income taxes paid by Arthur in respect of such reported business profits were repaid to him by Alfonso. Most of the profits so reported by Arthur, were retained in the business. The respondent, in his notice of deficiency for the years 1951 and 1952, adjusted the amounts of the business profits, and charged Alfonso with unreported net profits from the operation of Phil's Cafe in the amounts of $11,936.27 for the year 1951, and $20,152.41 for the *83 year 1952. He at the same time made a related adjustment in Alfonso's favor in respect of the $7,000 bonus, which Alfonso had reported on his 1952 return, but which had not been reflected on the books of the business. Respondent made no adjustment with regard to the salaries which Alfonso and his wife had reported, because these had been entered as expenses on the books of said business. Casino Bar and Restaurant. - This bar and restaurant which was located in Carlsbad, California, was owned and operated jointly by Alfonso and an individual named Nino Romano, during part of the taxable year 1951. The profit realized by the owners from the operation of this business in 1951, was not less than $2,059.47. No portion of this profit was reported by Alfonso on his income tax return for said year. Diana's Cafe. - This cafe, which was located in Oceanside, was owned and operated by Alfonso during the taxable year 1952. On his income tax return for the year 1952, he reported no income or loss from this business; but his brother Arthur, on his return for said year, reported a loss therefrom in the amount of $493.95. The respondent, in his notice of deficiency, charged Alfonso with unreported *84 net profit from operation of this business for the year 1952, in the amount of $1,506.65. Gambling activities. - Alfonso, during the taxable years involved, engaged extensively in race horse betting; and he usually carried about $2,000 in cash on his person for that purpose. He frequented the Del Mar and the Santa Anita race tracks; and, in 1950, he went to Florida to attend the races. In 1947, he won a bet of $11,000 from an individual named Clarence Sullivan, during the racing season at the Del Mar track; and this amount was paid to him in 1947, partly in cash and partly by delivery of an interest-bearing promissory note of Sullivan. In 1949, he won $2,652.50 from an individual named Dallas Palmer; and this amount was paid to him by Palmer, with two cashier's checks. On April 21, 1950, Alfonso was arrested by the Oceanside police, for "bookmaking." On this date, the police raided a house in Oceanside, in which were located telephones that were used for taking bets on races. The police placed a woman operator at the telephones; and, during the following period of about 4 1/2 hours, bets totaling $350 were called in. Also during this same period, each of Alfonso's brothers, Arthur *85 and Leo, called on the telephone and, not recognizing the operator's voice, attempted to identify her and find out what was going on. Subsequently, on August 2, 1950, Alfonso was convicted of "occupying room with betting paraphernalia"; and he was sentenced to serve 6 months in the county jail at San Diego. He was released from jail, as above stated, on February 27, 1951; and he thereupon resumed his gambling activities. During 1949 and until Alfonso's abovementioned arrest in 1950, an individual named Gaspar Cacioppo operated as Alfonso's agent in taking bookmaking bets on races; and received 10 per cent commissions for his services. Also, during the taxable years, an individual named Thomas Morris placed bets with Alfonso personally, and with an agent for Alfonso, named Ralph Swigart. Alfonso, in his income tax returns for the several taxable years here involved, did not report any income or loss from gambling or bookmaking. Miscellaneous sources of income. - In about July 1950, Alfonso and the above-mentioned Nino Romano, acting as equal partners, purchased a garage in Carlsbad, California. They had intended to use this property as the site for operation of a cafe and restaurant; *86 but, being unable to proceed with such plan, they leased the premises to another party. Romano collected the rent, and applied the same on the purchase price of the property. Alfonso's shares of the rental income for 1950 and 1951, were $330 and $660, respectively. None of this rental income was reported by Alfonso on his income tax returns for said years. Alfonso received also, interest from various sources in all of the taxable years involved, as follows: Source
1947
1948
1949
1950
1951
1952
C. L. Sullivan
$ 47.15
$186.45
R. Coe
33.05
176.60
$153.29
$131.56
$ 97.98
$158.02
Sav. A/c #21
67.35
90.31
160.91
57.50
88.69
38.43
Sav. A/c #7755
48.54
8.35
15.88
4.88
1.57
1.61
Sav. A/c #7757
123.40
16.77
105.23
53.57
.98
1.00
Carman-Yellow Cab
360.00
Atlas Alshouse
14.18
41.06
Ralph Houseman
112.88
73.46
5.61
Gerald Pratt
24.43
20.00
Obligations received on
sale of Roma Inn
42.25
Total
$319.49
$838.48
$562.37
$362.03
$261.51
$219.06 None of this interest income was reported by Alfonso on any of his income tax returns for the taxable years involved. Facts re Books and Records
*87 Alfonso did not personally maintain any books or records for any of the taxable years, other than certain cancelled checks and bank statements which were not complete. He relied upon his wife who had bookkeeping experience, to keep certain records for the cafes known as Casa Blanca, Phil's and Diana's; and, about once a month, either she or Alfonso delivered these to the office of a public accountant in San Diego, named Gordon C. Smith, who operated as a proprietor under the name of "Business Service." Smith and his employees, on the basis of such material, then maintained records of a more permanent character for said cafes. As regards the Roma Inn, neither Smith nor his employees received any records of this business from the petitioners; and they did not know that petitioners had any interest therein, until after the business had been sold. Records were then set up for this business, as could best be done. As regards the Top Hat Cafe and Bar, Smith had records for the year 1948; but he received none for the year 1949. As regards the Casino Bar and Restaurant, records were maintained by a bookkeeper named Oots, and they were delivered to petitioners when this business was *88 discontinued. Neither Smith nor his employees ever received any of these business records; and the records, though subpoenaed, were not produced by petitioners at the trial. Also, neither Smith nor his employees ever received any records regarding Alfonso's gambling and bookmaking activities, or regarding his receipt of any rents or interest. The income tax returns of Alfonso and his wife for all years involved, were prepared by Smith on the basis of such records as he maintained, and certain other information furnished by the petitioners. The usual practice of Smith and his employees was to make inquiry of a taxpayerclient at the time of preparing his return, as to whether he had any other income than that which had been disclosed to them. At the time of preparing one of the returns for petitioners, Alfonso told Smith that he gambled a little; and thereupon Smith requested Alfonso to check his bank accounts and determine whether he had gambling income which should be reported. Apparently Smith received a negative response; for no gambling income was reported for any of the taxable years involved. Smith included in the returns which he prepared for the petitioners, all items of *89 income which had been disclosed to him; and any items of income not included in the returns were not disclosed to him. Facts re Respondent's Adjustments and Net Worth Statement The petitioners, in their income tax returns for the several years involved, reported the following amounts of gross income (or loss) and tax due: Gross Income
Tax
1947
$ 1,206.08
None
1948
( 3,145.43)
None
1949
( 1,141.74)
None
1950
2,402.69
None
1951
7,321.30
$ 858.38
1952
16,028.39
3,245.66
The respondent, in his notices of deficiency, increased each of the above amounts of gross income by: (1) Adjusting various items shown in the returns; (2) including in income, certain items of unreported income from identified sources; and (3) including also substantial additional amounts of unreported income which could not be traced to any particular source. In determining the last-mentioned amounts of unreported income, he first reconstructed the petitioners' income for each year, by use of the net worth plus nondeductible personal expenditures method; and he then subtracted therefrom, the amounts of income reported on the returns, as increased by the specific adjustments *90 above mentioned. As regards the above-mentioned adjustments to items shown in the returns, and the inclusions of unreported income from identified sources, petitioners have conceded by stipulation, the correctness of all these adjustments except those relating to Phil's Cafe and Diana's Cafe for the years 1951 and 1952. As to these latter unconceded adjustments, there is no dispute as to the amounts of the unreported income included; and the sole dispute is whether such amounts are chargeable to the petitioners, rather than to Alfonso's brother Arthur. As regards the above-mentioned inclusions of additional unreported income which was determined by use of the net worth method, all of these amounts are in dispute. The respondent's net worth statement, as revised in certain respects prior to the trial, was received in evidence by agreement of the parties; and it is as follows: ASSETS
1-1-47
12-31-47
12-31-48
12-31-49
Cash in Banks
Sec. Tr. & Svgs. Bank A/c #21
$ 4,138.60
$ 6,275.11
$24,810.73
$ 9,929.38
Oceanside
Sec. Tr. & Svgs. Bank A/c
282.22
112.49
Comm. Oceanside
Bank of America, Comm. A/c
1,080.09
44.19
17.85
1,392.65
Oceanside
Bank of America, Sav. A/c
4,229.93
3,560.97
558.17
2,574.05
7755 Oceanside
Bank of America, Sav. A/c
9,704.42
10,087.82
6,990.51
7,095.74
7757 Oceanside
Notes Receivable
Richard R. Coe
3,284.51
3,131.11
2,984.38
Gerald Pratt
413.98
301.78
Jack Cantella
Leonard Thomas
Atlas-Allhouse Mtg.
1,550.00
Clarence L. Sullivan
9,000.00
Ralph Houseman (Sale of Top
2,412.88
Hat)
Poultry Packers of America,
Inc.
Other Receivables
Arthur Vitello - Advance
370.00 *
370.00 *
370.00 *
Investments
Roma Inn
2,400.00 *
Casa Blanca Cafe & Bar
17,177.46
16,276.43
12,104.49
9,981.01
Top Hat Cafe & Bar
6,086.70
Poultry Packers of America
Dianne's
Garage property & Casino
Phil's
Home and furnishings
11,000.00
11,879.20
12,840.95
13,263.03
Sub-total
$47,330.50
$60,778.23
$67,606.71
$54,367.39
Expenditures
Automobiles
$ 2,869.83
$ *
$ 2,730.00
Personal living expenses
4,207.52
3,953.43
2,936.59
Advances to Leo Vitello
2,050.00 *
2,077.00 *
2,761.25 *
Excess of bank withdrawals
over bank deposits
- unaccounted for
14,308.44 *
Total expenditures
$ 9,127.35
$ 6,030.43
$22,736.28
Grand total
$47,330.50
$69,905.58
$73,637.14
$77,103.67
*91 ASSETS
12-31-50
12-31-51
12-31-52
Cash in Banks
Sec. Tr. & Svgs. Bank A/c #21
$ 538.73
$16,732.93
$ 2,136.19
Oceanside
Sec. Tr. & Svgs. Bank A/c
748.52
23.47
15.02
Comm. Oceanside
Bank of America, Comm. A/c
146.81
689.76
306.38
Oceanside
Bank of America, Sav. A/c
78.93
80.50
82.11
7755 Oceanside
Bank of America, Sav. A/c
49.31
50.29
51.29
7757 Oceanside
Notes Receivable
Richard R. Coe
2,845.94
2,733.92
2,531.94
Gerald Pratt
291.78
325.22
327.62
Jack Cantella
10,000.00
Leonard Thomas
900.00 *
Atlas-Allhouse Mtg.
Clarence L. Sullivan
Ralph Houseman (Sale of Top
616.34
Hat)
Poultry Packers of America,
23,500.00 *
Inc.
Other Receivables
Arthur Vitello - Advance
370.00 *
370.00 *
370.00 *
Investments
Roma Inn
650.00 *
Casa Blanca Cafe & Bar
10,339.08
13,010.74
16,076.55
Top Hat Cafe & Bar
Poultry Packers of America
2,625.00
Dianne's
2,738.81
Garage property & Casino
3,824.53
4,775.71
4,775.71
Phil's
12,598.27 *
23,822.42 *
31,309.56 *
Home and furnishings
14,160.44
14,264.49
14,264.49
Sub-total
$47,257.68
$76,879.45
$112,010.67
Expenditures
Automobiles
$ 1,701.58
$ 1,591.84
$ 1,923.59
Personal living expenses
9,947.04 *
11,145.94 *
10,782.38 *
Advances to Leo Vitello
( 250.00) *
5,000.00 *
Excess of bank withdrawals
over bank deposits
- unaccounted for
Total expenditures
$11,399.62
$12,737.78
$ 17,705.97
Grand total
$58,657.30
$89,617.23
$129,716.64
*92 In the preparation of the above net worth statement, respondent's agents interviewed the petitioners, their accountant, and their business associates. Also, these agents examined among other things, petitioners' bank accounts, various cancelled checks, and such business and personal records as could be located. They exhausted all leads obtained from any source. Petitioners have agreed by stipulation, that all items shown in the above net worth statement, except those which have been marked with an asterisk, were either assets of theirs on the dates indicated, or were expenditures made by them during the years indicated. As regards the non-agreed items which have been marked with an asterisk, the material facts are as follows: Note receivable from Leonard Thomas, 1952. - It has been stipulated that on December 23, 1952, Leonard J. Thomas received $900 from petitioner Alfonso Vitello. This amount was not repaid to Alfonso during said year. The item is properly includible as an asset of the petitioners, as of December 31, 1952. Note receivable from Poultry Packers of America, Inc., 1952. - In 1952, Alfonso loaned $23,500 to Poultry Packers of America, Inc. It has been stipulated *93 that on about August 15, 1952, the board of directors of said corporation passed a resolution to accept said loan; that, on about August 27, 1952, Alfonso delivered to the corporation his personal check and a cashier's check, totalling $23,500; and that on August 28, 1952, the corporation deposited said checks in its bank account, and entered the amount of $23,500 in its general ledger, as an account payable to Alfonso. All of the funds used by Alfonso in making this loan were his own. No part of said loan was repaid during the year 1952. This item is properly includible as an asset of the petitioners, as of December 31, 1952. Receivable from Arthur Vitello, 1947-1952. - It has been stipulated that on or about March 7, 1947, Arthur Vitello received $370 from petitioner Alfonso. This amount was not repaid during any of the taxable years involved. The item is properly includible as an asset of the petitioners, as of December 31 of each of the taxable years involved. Investment in Roma Inn, 1949 and 1950. - On December 8, 1949, Alfonso and his brother Leo sold to Giuseppi Catalioti the Roma Inn, including all furniture, fixtures, and supplies on hand, for a total consideration of *94 $4,800. Of this amount, $1,000 was paid into an escrow at the time of the sale, and was not disbursed to the sellers until the following year; so that at the close of the year 1949, Alfonso and Leo each had an interest of $2,400 in the purchaser's obligation. Thereafter in 1950, the purchaser paid $2,500 additional into the escrow; and during said year the entire amount of the escrow was distributed to Alfonso and Leo. At the close of the year 1950, Alfonso and his brother each had a remaining interest of $650 in the unpaid balance of the purchaser's obligation. This item is properly includible as an asset of the petitioners, in the respective amounts of $2,400 and $650, as of December 31, 1949 and 1950. Investment in Phil's Cafe, 1950, 1951, and 1952. - The respondent determined the amounts of these items, by including Alfonso's initial 1950 investment in Phil's Cafe, plus that portion of the 1951 and 1952 cafe profits which were retained in the business. Petitioners have not disputed the amounts of these items; but they contend that the same represent investments of Alfonso's brother Arthur. We have hereinabove found as facts, that Arthur's only connection with the business *95 was that of being the nominal holder of the liquor license; that all amounts invested in the furniture, fixtures and the liquor license, were paid by Alfonso and his wife; that Alfonso reimbursed Arthur for all amounts paid as income tax on the income of the business; and that, at all times material, Alfonso actually was the sole owner of Phil's Cafe. These items, in the respective amounts indicated, are properly includible as assets of the petitioners, as of December 31, 1950. 1951 and 1952. Expenditures for Automobiles, 1948. - The respondent included no amount in the net worth statement, in respect of this item for the year ended December 31, 1948. This omission was apparently an oversight; for the parties have included among certain net worth items which they stipulated, an expenditure of $1,000 for automobiles during the year 1948. Said amount of $1,000 is properly includible as a non-deductible expenditure for the year ended December 31, 1948. Expenditures for Personal Living Expenses, 1950, 1951 and 1952. - For the year 1950, respondent included under this heading in the net worth statement, the amount of $9,947.04. During said year, petitioners expended $2,000 for *96 personal legal fees; $2,719.67 for expenses of a personal trip to Florida; and $5,227.37, represented by small checks drawn from three of their bank accounts, for unidentified purposes. Said total amount of $9,947.04 is properly includible as nondeductible personal living expenses of petitioners, for the year 1950. For the year 1951, respondent included under this heading, the amount of $11,145.94, representing unidentified withdrawals of $4,950 from petitioners' savings account #21 at the Security Trust & Savings Bank, Oceanside, and other unidentified withdrawals of $6,195.94 from their other various bank accounts. At the trial, it was established that $710.28 of said withdrawals was used by petitioners to meet certain net expenses relating to Phil's Cafe. The purpose for which the balance of the said withdrawals was made can not be identified. Said balance of $10,435.66 is properly includible as nondeductible personal expenses of petitioners for 1951. For the year 1952, the respondent included under this heading, the amount of $10,782.38. During said year, Alfonso and his wife withdrew from Phil's Cafe, as "salary," the total amount of $5,900 for unidentified purposes; and in *97 addition they withdrew $4,882.38 from two of their bank accounts, which also was for unidentified purposes. Said total amount of $10,782.38 is properly includible as nondeductible personal expenditures of petitioners, for the year 1952. Expenditures - Advances to Leo Vitello, 1947-1952. - On February 11, 1947, Alfonso advanced on behalf of his brother Leo, the amount of $2,050 for the purchase of an airplane. On April 12, 1948, he delivered a check to Leo in the amount of $2,077. On April 1, 1949, and on November 10, 1949, he advanced to Leo by cash and checks, the respective amounts of $8,000 and $2,000; on October 18 of the same year, he received from Leo, an advance of $3,750 on behalf of the Roma Inn, and also he retained Leo's share of the proceeds from the sale of the liquor license for the Roma Inn, in the amount of $3,488.75; and the net result of all these 1949 transactions was a balance due Alfonso, of $2,761.25 for the year 1949. In February 1950, Leo received and retained Alfonso's one-half share of the proceeds from sale of the furniture and fixtures of the Roma Inn, in the amount of $1,750; on July 1, 1950, Alfonso received and retained a refund of bail money in the *98 amount of $2,000, which had been advanced on his behalf by Leo; and the net result of these 1950 transactions was a balance due Leo, of $250 for the year 1950. On January 2, 1952, Alfonso deposited $5,000 in Leo's bank account, which amount had previously been withdrawn by Alfonso from his own bank account. Except as above mentioned, none of the advances made by Alfonso to Leo were repaid. The net amounts advanced by Alfonso to Leo, for the respective years indicated, have been properly included in the net worth statement for such years, as nondeductible expenditures. Expenditures - Excess of bank withdrawals over bank deposits, 1949. - During the period from February 10 to December 2, 1949, Alfonso made 13 separate withdrawals from his savings account for unidentified purposes, in amounts ranging from $333.44 to $3,000 each. The total of these withdrawals was $15,533.44. Also, on October 18, 1949, he retained for unidentified purposes, out of the proceeds from the sale of the Roma Inn liquor license, cash in the amount of $3,000. During the year 1949, Alfonso and his wife made cash deposits in other bank accounts from unidentified sources, which totaled $3,025; and the respondent *99 has treated these as having been redeposits of part of the above-mentioned withdrawals by Alfonso for unidentified purposes. Respondent also has treated $1,200 of said withdrawals made by Alfonso for unidentified purposes, as having been part of the 1949 personal living expenses which he included in the net worth statement under that heading. Such treatment left a balance of $14,308.44, representing cash available to Alfonso for unidentified purposes. Said amount of $14,308.44 is properly includible in the net worth statement, as nondeductible expenditures for the year 1949. Respondent included no liabilities in the above net worth statement, other than the $250 owing to Leo at the end of the year 1950. The reason for this is that respondent's agents were unable to discover any other liabilities, in the course of their investigations. The petitioners presented no evidence of any outstanding liability, as of any of the dates indicated in the statement. The annual increases in petitioners' net worth, the amounts of their nondeductible expenditures for each year, the amounts of their unreported income for each year, and a summary of the results for all years - as reflected in the *100 net worth statement after giving effect to the adjustments which we have hereinabove approved - are as follows: 1-1-47
12-31-47
12-31-48
12-31-49
Net worth $47,330.50
$60,778.23
$67,606.71
$54,367.39
Net worth prior year
47,330.50
60,778.23
67,606.71
Net worth increase
$13,447.73
$ 6,828.48
($13,239.32)
Add: Nondeductible expenditures,
as adjusted
9,127.35
7,030.43
22,736.28
Corrected income per state-
ment
$22,575.08
$13,858.91
$ 9,496.96
Less: Adjusted gross income re-
ported in returns
1,206.08
( 3,145.43)
( 1,141.74)
Unreported income from iden-
tified and unidentified
sources
$21,369.00
$17,004.34
$10,638.70
Net worth December 31, 1952
Starting net worth January 1, 1947
Total net worth increase
Add: Total nondeductible expenditures
Total income per statement
Less: Total adjusted gross income reported
in returns
Total unreported income
1-1-47
12-31-50
12-31-51
12-31-52
Net worth $47,330.50
$47,257.68
$76,879.45
$112,010.67
Net worth prior year
54,367.39
47,257.68
76,879.45
Net worth increase
($ 7,109.71)
$29,621.77
$ 35,131.22
Add: Nondeductible expenditures,
as adjusted
11,399.62
12,027.50
17,705.97
Corrected income per state-
ment
$ 4,289.91
$41,649.27
$ 52,837.19
Less: Adjusted gross income re-
ported in returns
2,402.69
7,321.30
16,028.39
Unreported income from iden-
tified and unidentified
sources
$ 1,887.22
$34,327.97
$ 36,808.80
Net worth December 31, 1952
$112,010.67
Starting net worth January 1, 1947
47,330.50
Total net worth increase
$ 64,680.17
Add: Total nondeductible expenditures
80,027.15
Total income per statement
$144,707.32
Less: Total adjusted gross income reported
22,671.29
in returns
Total unreported income
$122,036.03
*101 Facts re Statute of Limitation for 1951 - Section 275(c) The petitioners reported on their joint income tax return for the year 1951, $5,000 of gross income representing "salary" received from Phil's Cafe; and they are deemed to have reported also, gross income from Casa Blanca Cafe and Bar in the amount of $20,800.55, which is Alfonso's one-third share of the gross income of $62,401.63 reported on the Casa Blanca partnership return. Thus, petitioners are deemed to have reported on their joint return for said year, gross income in the total amount of $25,800.55. Twenty-five per cent of $25,800.55 is $6,450.14. Petitioners omitted from gross income on their return for the year 1951, the following amounts which are properly includible therein (exclusive of the additional unreported income for said year, which is reflected in the net worth statement): Gross income from Phil's Cafe, unre-
ported ($34,601.06 gross income as
reported by Arthur on his return,
less above-mentioned $5,000 thereof
reported on petitioners' return)
$29,601.06
Gross income from rent, unreported
660.00
Gross income from interest, unre-
ported
261.51
$30,522.57
Findings of Ultimate *102 Facts The books and records of the petitioners for all years involved, were incomplete and inadequate; and they were not sufficient to make possible a determination therefrom of petitioners' actual income for any of the taxable years. Part of the deficiency for each of the taxable years was due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code. The return of the petitioners for each of the taxable years was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the Code. Petitioners omitted from gross income for the year 1951, an amount properly includible therein, which is in excess of 25 per cent of the amount of gross income stated in their return for said year. Opinion I. The first issue for decision is whether the petitioners understated on their returns, the amount of their income for each of the taxable years involved. Based on the concessions which the petitioners have now made, and even apart from the amounts of unreported income reflected by respondent's net worth statement, this question must be answered in the affirmative. As hereinbefore shown, the petitioners reported on their returns, *103 the following amounts of gross income or loss, and the following amounts of tax due: Gross income
Tax
1947
$ 1,206.08
None
1948
( 3,145.43)
None
1949
( 1,141.74)
None
1950
2,402.69
None
1951
7,321.30
$ 858.38
1952
16,028.39
3,245.66
The first class of adjustments to the returns, which the respondent made in his notices of deficiency, was that certain items of the returns should be adjusted to reflect the following additional amounts of income: 1947
$1,000.00
additional income from Casa
Blanca Cafe and Bar
1948
1,000.00
additional income from Casa
Blanca Cafe and Bar
113.31
reduction of loss from Top Hat
Cafe and Bar
1949
843.33
increased net capital gain from
sale of Roma Inn
1,000.00
additional income from Casa
Blanca Cafe and Bar
1950
1,000.00
additional income from Casa
Blanca Cafe and Bar
1951
219.26
unreported income from in-
terest
1952
219.06
unreported income from in-
terest Petitioners have conceded, by written stipulation, that all the foregoing adjustments are correct. The second class of adjustments made by respondent in his notices of deficiency, *104 was that there should be included in petitioners' incomes for the years 1951 and 1952, the following amounts of unreported income from identified sources: 1951
$11,936.27
unreported net profits from
Phil's Cafe
1952
14,659.06
unreported net profits from
Phil's Cafe, and from Di-
ana's Cafe The facts regarding these two businesses have been fully set forth in our Findings of Fact. We have therein found, as facts, that Alfonso's brother Arthur, who reported the income from Phil's Cafe on his own returns and paid the taxes thereon with money supplied to him by Alfonso, was merely the nominal owner; that he performed no services in connection with this business, drew no salary therefrom, and derived none of the profits; and that Alfonso was at all times material, the actual owner of this business. And we also have found, as a fact, that Alfonso and not Arthur was the actual owner of Diana's Cafe. On the basis of such facts, we hold that respondent has proved by an overwhelming preponderance of the evidence, that the above-stated amounts of unreported additional income are properly chargeable to the petitioners. The third class of adjustments to *105 the petitioners' returns, was the addition of substantial amounts of unreported income from unidentified sources, based on a reconstruction of the petitioners' incomes for all taxable years through use of the net worth plus nondeductible expenditures method. At the trial, the respondent presented a revised net worth statement which reflected certain revisions of the prior net worth statement that had been used in preparing the notices of deficiency. This was received in evidence by agreement of the parties; and the respondent then assumed the burden of proving by affirmative evidence, each of the specific items set forth in such revised net worth statement. It is our opinion that, except for two minor adjustments which we have specifically set forth and approved in our Findings of Fact (being an agreed addition of $1,000 to the expenditures for automobiles in the year 1948; and a reduction of $710.28 in the amount of the personal living expenses shown for the year 1951), the correctness of all items of said revised net worth statement has been established by a preponderance of the evidence. There can, in our opinion, be no reasonable doubt that respondent's use of such net worth *106 statement, in reconstructing petitioners' incomes for the several years involved, was clearly justified. As shown in our Findings of Fact, Alfonso at no time personally maintained any books or records, other than certain cancelled checks and bank statements which were not complete. Although certain records were maintained by his wife and his accountant Smith, for some of the cafes and bars in which he had an interest, neither of these parties either maintained or was supplied with information regarding miscellaneous other income which Alfonso derived from various sources. For example, the accountant Smith who prepared all the returns here involved, was not given any current records or information regarding the Roma Inn; neither he nor any of his employees was informed that Alfonso had any interest in said Inn until after it had been sold; and then, for the first time, records were attempted to be made up from such information as could be assembled. Smith also received no records or information regarding Alfonso's operation of the Top Hat Cafe and Bar for the year 1949. He at no time received any records or information relating to the Casino Bar and Restaurant. And he likewise received *107 no records or information for any year, regarding Alfonso's income from rents, from interest, and from his various gambling activities. We hold that, by reason of all the foregoing, the respondent was fully justified in rejecting the returns as filed, in refusing to rely solely on the incomplete and inadequate records which were made available to him, and in reconstructing the petitioners' incomes for all years involved by use of the net worth method. We are satisfied also, that the revised net worth statement which was received in evidence, was properly prepared after full and adequate investigation, notwithstanding the two minor adjustments thereto which we have approved; and that said statement fully meets all legal requirements. Prior to its preparation, Alfonso was requested by respondent's agents to supply a net worth statement of his own making, but such request was rejected. Thereafter, the net worth statement which was received in evidence, was prepared by respondent's agents on the basis of extensive examinations of all available business and personal records of the petitioners, including among other things all available cancelled checks, bank statements, promissory notes, *108 cafe records, and various instruments pertaining to Alfonso's purchase and sale of business properties. Collateral investigations also were made in Cleveland, Miami and Phoenix, where Alfonso had business transactions. And interviews were had not only with Alfonso, but also with members of his family, with his accountant, and with his business associates. All leads which the agents obtained from any source, were exhausted. It is significant that most items of the net worth statement, which were developed through such examinations, have been conceded by petitioners to be either assets which they actually owned on the dates indicated, or to be expenditures which they actually made during the years indicated. And, as to the remaining disputed items, these have been established affirmatively by testimony and documentary records received at the trial. Accordingly, we hereby approve the respondent's net worth statement as received in evidence, and as specifically modified by us in the two minor respects above mentioned. There are three contentions which were made by petitioners in answer to the net worth statement, which require separate comment. These are: "1. That, when Alfonso's *109 father died in Cleveland in 1926, he left Alfonso's mother about $100,000 in currency; that the mother, upon coming to California in 1943, brought approximately $75,000 of such currency with her in a small traveling bag, and thereafter kept the same in a secret place in her home; that during the years 1945 and 1946, she gave Alfonso's brother Leo about $50,000 of said currency, from which Leo thereafter gave various amounts to Alfonso; that the mother, in 1948 or 1949, also gave Alfonso between $15,000 and $17,000 of such currency, which is reflected among his assets as shown in the net worth statement. "2. That the item of $14,308.44, which is included in the net worth statement for the year 1949 under the heading of 'Excess of bank withdrawals over bank deposits - unaccounted for,' represents moneys which Alfonso withdrew from the banks for use in gambling; that when he was sent to jail in 1950, he placed approximately $14,000 of this amount in a sealed envelope which was kept in a safe at the Casa Blanca Cafe and Bar; that, after his release from jail in 1951, he redeposited this money in his bank accounts; and that such redeposits are reflected in his increased assets for 1951 *110 that are shown on the net worth statement. "3. That Alfonso never derived any income from gambling, because his losses always exceeded his winnings; that he never engaged in any bookmaking on horse races; and that the bookmaking house in which he was arrested in 1950, was not operated by him, but rather by a girl named Ruth Nelson." As regards the first of these contentions - to the effect that Alfonso's father left $100,000 to his mother, of which she brought $75,000 to California in a traveling bag, and thereafter made gifts to Alfonso and Leo - we are of the opinion that the testimony regarding this story is not credible. The only evidence presented in support of such story is the testimony of the mother, Alfonso, and Leo; and this not only is unsupported by any documentary exhibits or records whatsoever, but also is ambiguous and indefinite as to all dates, and as to the amounts of all the alleged gifts therefrom. Moreover, such testimony is out of harmony with the facts pertaining to the Vitello family history, and inconsistent with any reasonable probability that the father, at the time of his death, left any such sum of money. As shown in our Findings of Fact, the business *111 of Alfonso's father was principally that of a coal miner, and the operator, from time to time, of a small neighborhood grocery store. There is some suggestion in the testimony of Alfonso and his mother, that the father had engaged in counterfeiting; but such testimony is unsupported, indefinite and inconclusive; and there is certainly no evidence whatever that such alleged activity produced a cache of $100,000. Neither the father nor the mother ever filed an income tax return; no estate tax return was filed for the father's estate; and, at the time of the father's death, the family home was encumbered with a mortgage of about $2,000, which the members of the family paid off during a subsequent 12-year period. Moreover, the story of the mother bringing $75,000 to California in a small traveling bag and thereafter keeping it in a secret place in her house, appears fantastic. Also, it is significant that in 1944, Alfonso made a bank deposit of $10,000 in the name of himself and his mother, which thereafter was transferred to the name of the mother alone; and that for each of the years 1946 and 1947, Alfonso's mother was claimed by Leo on his income tax returns, as a dependent. After seeing *112 and hearing all of the witnesses who testified regarding this $100,000 hoard, we are impelled to conclude that the story is untrue; that the testimony of the family members regarding the same is not credible or worthy of belief, and that said defense, for these reasons, should be rejected. As regards the second of petitioners' above-mentioned contentions - to the effect that the unidentified bank withdrawals of about $14,000 in 1949, represented gambling funds which he kept in a sealed envelope in the Casa Blanca Cafe safe during his period of jail confinement, and which he then redeposited in his bank in 1951 - we are impelled to reject this story also, as being not credible and not worthy of belief. We have carefully examined the record of each bank account involved; and we have found therefrom, that none of Alfonso's bank accounts was either closed or inactive during the period of his jail confinement, and that none of the numerous withdrawals made in 1949 can in any way be identified with any of the other numerous relatively small deposits which were made in 1951. Moreover there is no account, list or other record, which tends to show that Alfonso actually kept either $14,000 *113 or any other specific amount of money in the Casa Blanca safe during his period of jail confinement. It is significant that $2,000 bail for Alfonso was advanced by Leo, notwithstanding that he is claimed to have had access to the alleged sealed envelope; and that when this bail money was refunded in July 1950, all of the same was retained by Alfonso. We believe, after hearing Alfonso testify, that his testimony regarding this $14,000 is untrue. Finally, as regards Alfonso's testimony that he never derived any net income from gambling and that he never engaged in bookmaking for horse races, we think that this testimony also is not credible. Alfonso conceded that, during the taxable years, he did "a lot" of betting on horse races; and that he usually carried about $2,000 in his pocket for that purpose. Also, there is positive evidence of at least two bets which he won in the respective amounts of $11,000 and $2,652.50, neither of which was reported for income tax purposes; and no facts were presented in evidence or could be found, of any particular gambling loss. There can be no question that his gambling activities do constitute a potential source of the undisclosed income for all *114 the taxable years, which is reflected in the net worth statement. As regards Alfonso's bookmaking activities, the evidence establishes that during the year 1949, a man named Cacioppo operated as Alfonso's agent in taking bookmaking bets on races on a 10 per cent commission basis; and that another man, named Ralph Swigart, also acted as his agent for such purpose. In 1950, Alfonso was arrested by the Oceanside police in a raid on a bookmaking establishment; and he was thereafter convicted in a California court of "occupying room with betting paraphernalia," and was confined in jail on this offense, for a period of about 6 months. Alfonso testified that such arrest resulted from an attempt of the police chief to "get him," because of personal animosity; and that the owner of the bookmaking house in which he was arrested, was a girl named Ruth Nelson to whom he merely delivered bets for himself and friends. The evidence establishes, however, that Ruth Nelson actually was a waitress whom Alfonso employed in one of his cafes; and Alfonso's conviction by the California court cannot be disregarded merely on the basis of his own unsupported testimony. We believe that Alfonso did engage in *115 bookmaking; and that such activity is another potential source of the undisclosed income for all the taxable years involved, which is reflected in the net worth statement. We hold that the unreported income reflected in the net worth statement received in evidence, as herein adjusted, should be given effect in the recomputation of petitioners' incomes for all taxable years here involved. II. The second and third issues for decision are respectively, whether part of the deficiency for each of the taxable years is due to fraud with intent to evade tax; and whether the petitioners' returns for the years 1947, 1948, 1949 and 1951, were false and fraudulent with intent to evade tax, so that assessment of the deficiencies for said years is not barred by limitation. The respondent had the burden of proof as to each of these issues; and it is our opinion that he fully sustained this burden. Our summary of the adjusted net worth statement that we have approved, which is set forth in our Findings of Fact, reflects the following: Correct in-
come, per
Income re-
net worth
ported in
Unreported
Year
statement
returns
income
1947
$ 22,575.08
$ 1,206.08
$ 21,369.00
1948
13,858.91
(3,145.43)
17,004.34
1949
9,496.96
(1,141.74)
10,638.70
1950
4,289.91
2,402.69
1,887.22
1951
41,649.27
7,321.30
34,327.97
1952
52,837.19
16,028.39
36,808.80
Totals
$144,707.32
$22,671.29
$122,036.03
*116 We have hereinbefore pointed out, that the correctness of the items of such net worth statement as adjusted, does not rest upon a mere presumption of correctness attaching to determinations of the respondent; but rather, that the correctness of all the items has been affirmatively established to our satisfaction, either by concessions of the petitioners, or through our analysis and weighing of all evidence presented as to disputed items. In , the Supreme Court held that "evidence of a consistent pattern of underreporting large amounts of income" will support "an inference of willfulness" to defraud. Likewise, in , affirming so far as pertinent a Memorandum Opinion of this Court [; , the Court of Appeals for the Third Circuit said at page 734: "Even if this case were devoid of the usual indicia of fraud, the consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent. See , * * *; . *117 * * *" To the same effect, see also: (C.A. 6); and (C.A. 8). But the record of the instant case shows that there is more than the repeated substantial understatements of income reflected in the net worth statement; and this has been recognized to be an element of added importance. , on appeal (C.A. 8); (C.A. 2), affirming , certiorari denied . Here, there is failure by the petitioners to maintain complete and adequate books and records; failure to inform the accountant, to whom was delegated the responsibility of preparing the returns, of numerous substantial items and sources of income; failure to report any income from certain cafes, from rents, from numerous items of interest, and from various gambling activities; causing the incomes from Phil's Cafe and Diana's Cafe to be reported by another person; and presentation of testimony which we have found to be untrue, and which we believe was intended to mislead. We are impelled to conclude *118 that petitioners' omissions from income are too many, too varied, too continuous, and too excessive, to be plausibly attributed to inadvertence or carelessness. We are convinced also, that when petitioners filed their return for each of the years involved, they were aware that they had income in excess of that which they reported; and that they willfully intended to conceal such additional income, and to evade the tax thereon. We hold that at least part of the deficiency for each of the taxable years involved, was due to fraud with intent to evade tax within the meaning of section 293(b) of the 1939 Code. Regarding the question whether assessment of the deficiencies for the several years is barred by limitation, we hold, for the reasons above stated, that the return of petitioners for each of the taxable years involved, was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the Code; and hence, that each of such deficiencies may be assessed at any time. By reason of this latter holding, it is unnecessary for us to decide the alternative question, of whether the period of limitation for the year 1951 is open under section 275(c) of the Code. But, *119 if it were necessary to pass upon such question, we have hereinbefore found as a fact, that petitioners omitted from gross income for said year an amount properly includible therein, which is in excess of 25 per cent of the gross income stated in their return; and hence, that the period of limitation for the year 1951 is open under said section. Decisions will be entered under Rule 50.